**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | | |
|---|---|---|
| CDL DIRECT, LLC, ELDT DIRECT, LLC, and ELDT CHIMP, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION, PATRICK D. NEMONS, Director, Office of Safety Programs, FMCSA, in his official capacity,<br><br>Defendants. | ) | Case No. |

**<u>VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF</u>**

Plaintiffs CDL Direct, LLC ("CDL Direct"), ELDT Direct, LLC ("ELDT Direct"), and ELDT Chimp, LLC ("ELDT Chimp") (each a "Plaintiff" and together "Plaintiffs") bring this action against Defendants, the Federal Motor Carrier Safety Administration ("FMCSA"), the Department of Transportation ("DOT"), and Patrick D. Nemons, Director, Office of Safety Programs, FMCSA, in his official capacity ("Nemons," together with FMCSA and DOT collectively referred to as "Defendants"). In support thereof, Plaintiffs allege as follows:

## INTRODUCTION

1. Plaintiffs seek a temporary restraining order against Defendants and a preliminary injunction requiring Defendants to restore their respective listings on the Entry-Level Driver Training Provider Registry ("TPR"), from which the FMCSA removed CDL Direct, ELDT Direct, and ELDT Chimp on August 31, 2026 without prior notice of the ground asserted or any assurance of a prompt post-deprivation hearing or a prompt decision. Each Plaintiff is an online, theory-only training provider. None delivers behind-the-wheel training.

2. Plaintiffs' removals were among the 103 emergency removals that the FMCSA executed on the afternoon of August 31, 2026, in a span of six hours and eleven minutes, at an average interval of 3.6 minutes per removal. FMCSA's own Registry records the time of each removal: CDL Direct was the third provider removed that afternoon, at 1:40 p.m. Eastern Daylight Time; ELDT Chimp was the seventh, at 1:53 p.m.; and ELDT Direct was the seventeenth, at 2:49 p.m. Before that day, only six emergency removals existed in the entire history of the TPR. No Plaintiff received pre-deprivation notice of the English-proficiency ground, an opportunity to respond, or a hearing of any kind.

3. FMCSA's evidentiary basis is thin on its face. As to CDL Direct, FMCSA identified 171 driver-trainees out of approximately 36,000 whose theory completions CDL Direct reported — fewer than one half of one percent. As to ELDT Direct, FMCSA identified 61 out of approximately 2,900 — approximately two percent. As to ELDT Chimp, FMCSA identified 90 out of approximately 12,500 — approximately .72 percent. Four of CDL Direct's 171 records, one of ELDT Direct's 61, and six of ELDT Chimp's 90 are chronologically impossible, showing a citation date preceding the training date FMCSA itself recorded. FMCSA has published no threshold, rate, or standard by which any of these figures was measured, and the Notices of Emergency Removal state none.

4. The emergency removals have destroyed Plaintiffs' businesses. Students cannot complete their training. Employees face layoffs. Absent immediate relief from this Court, Plaintiffs will be forced to close permanently—a harm that no after-the-fact administrative review can undo.

## PARTIES

5. CDL Direct, is a Delaware limited liability company whose principal place of business is in Miami Florida, where its Director of Operations directs, controls and coordinates its activities and where its records are kept. FMCSA addressed its Notice of Emergency Removal to CDL Direct at 1855 N. Trawood Drive, Suite #207, El Paso, TX 79935.

6. CDL Direct is an entry-level driver training provider authorized to deliver Class A and Class B online theory training. CDL Direct does not provide behind-the-wheel training. FMCSA's own Training Provider Registry records this fact. Mr. Magdiel Fernandez serves as Director of

Operations. The Registry maintains, for each listed training-provider location, structured fields identifying the modes and types of training that location offers. For CDL Direct's location (Location Id 0e7e7fd8-eb40-4184-83d8-1b71ec1c9c1b), those fields record that the location is online and not physical, that theory training is offered, and that neither range training nor public-road training is offered. FMCSA held this information in its own system on August 31, 2026, when it issued the Notice of Emergency Removal. Every one of the 171 records in the spreadsheet enclosed with that Notice is attributed to that location.

7. ELDT Direct, is a Delaware limited liability company whose principal place of business is in Miami, Florida, where its Director of Operations directs, controls and coordinates its activities and where its records are kept. FMCSA addressed its Notice of Emergency Removal to ELDT Direct at 11801 Pierce St. Suite 200, Riverside, CA 92505.

8. ELDT Direct is an entry-level driver training provider authorized to deliver Class A and Class B online theory training. ELDT Direct does not provide behind-the-wheel training. FMCSA's own Training Provider Registry records this fact. Mr. Magdiel Fernandez serves as Director of Operations. The Registry maintains, for each listed training-provider location, structured fields identifying the modes and types of training that location offers. For ELDT Direct's location (Location Id 41c0da49-f73c-4784-b311-dbc6d7376d61), those fields record that the location is online and not physical, that theory training is offered, and that neither range training nor public-road training is offered. FMCSA held this information in its own system on August 31, 2026, when it issued the Notice of Emergency Removal. Every one of the 61 records in the spreadsheet enclosed with that Notice is attributed to that location.

9. ELDT Chimp, is a Delaware limited liability company whose principal place of business is Miami, Florida. Its officers direct, control, and coordinate the company's activities from Miami, Florida, where its operational and business records are maintained. FMCSA addressed its Notice of Emergency Removal to ELDT Chimp at 389 Palm Coast Parkway SW, Suite 4, Palm Coast, Florida 32137.

10. ELDT Chimp is an entry-level driver training provider authorized to deliver Class A and Class B online theory training. ELDT Chimp does not provide behind-the-wheel training. FMCSA's own Registry records this fact. Mr. Magdiel Fernandez serves as Director of

Operations. For ELDT Chimp's sole location (Location Id f14c1567-3096-4f5c-973b-475ee4b8f1a4), listed on the Registry since September 25, 2024, the Registry's structured fields record that the location is online and not physical, that theory training is offered, and that neither range training nor public-road training is offered. FMCSA held this information in its own system on August 31, 2026, when it issued the Notice of Emergency Removal. Every one of the 90 records in the spreadsheet enclosed with that Notice is attributed to that location.

11. The FMCSA is an agency of the United States within the DOT. The FMCSA is responsible for administering the TPR under 49 U.S.C. § 31305 and 49 C.F.R. Part 380, Subparts F and G.

12. The DOT is a cabinet-level department of the United States government and the parent agency of the FMCSA.

13. Nemons is the Director of the Office of Safety Programs within the FMCSA and is named in his official capacity. Nemons signed the August 31, 2026 Notices of Emergency Removal that are the subject of this action. *See* Notices of Emergency Removal dated August 31, 2026, copies of which are attached as **Composite Exhibits A, B, and C.**

## JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution of the United States. Plaintiffs assert claims under the Due Process Clause of the Fifth Amendment and seek to enjoin federal agency action that exceeds the scope of the agency's delegated statutory authority.

15. This action does not seek judicial review of a "final order" within the meaning of 28 U.S.C. § 2342(3)(A). The FMCSA emergency removal at issue is not a final agency order. The FMCSA's own regulation, 49 C.F.R. § 380.723(d)(2), expressly designates the FMCSA's decision on administrative review as "final Agency action." No decision on administrative review has been issued. Because no final agency action exists, 28 U.S.C. § 2342(3)(A) does not divest this Court of jurisdiction.

16. A "final order" for purposes of 28 U.S.C. § 2342 is not coextensive with "final agency action" under the Administrative Procedure Act. The statute confers exclusive jurisdiction over "rules, regulations, or final orders," not over all final agency action, and some agency conduct accordingly remains subject to review in the district court in the first instance. *See Miccosukee Tribe of Indians of Fla. v. United States*, 680 F. Supp. 2d 1308, 1317 (S.D. Fla. 2010) (recognizing that the "final agency action requirement" is inapplicable to a constitutional claim under the Due Process Clause of the Fifth Amendment) (citing *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1240-41 (11th Cir. 2003)).

17. Plaintiffs' claims arise under the Fifth Amendment to the United States Constitution, and this Court has jurisdiction over them under 28 U.S.C. § 1331. The emergency removals concerning Plaintiffs were issued without hearing, without an adjudicatory record, and without any adjudicatory proceeding of any kind. There is no record of the kind that review in a court of appeals presupposes, because the FMCSA created none.

**B. Venue**

18. Venue is proper in this District under 28 U.S.C. § 1391(e)(1). Defendants are agencies of the United States and an officer of the United States sued in his official capacity. Venue lies in this District where a substantial part of the events giving rise to the claims occurred and, no real property being involved, where a plaintiff resides. 28 U.S.C. § 1391(e)(1)(B), (C). An entity plaintiff resides in the district of its principal place of business. 28 U.S.C. § 1391(c)(2). CDL Direct's, ELDT Direct's and ELDT Chimp's operations are directed from their offices located in Miami, Florida, where they maintain records and where their Director of Operations conducts business.

19. Where one plaintiff resides in the district, venue under § 1391(e) is proper as to all plaintiffs. *See Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336 (6th Cir. 2005) (holding, under the predecessor provision, that the residency requirement "is satisfied if at least one plaintiff resides in the district in which the action has been brought").

**C. Sovereign Immunity**

20. Sovereign immunity does not bar this action.

21. The provisions of 5 U.S.C. § 702 include a freestanding waiver of sovereign immunity for this action. It states that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or an employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States."

22. This waiver is not limited to claims that challenge action under the Administrative Procedure Act. *See Miccosukee Tribe of Indians of Fla. v. United States*, 680 F. Supp. 2d 1308, 1316 (S.D. Fla. 2010) ("Section 702 is, however, a general waiver of sovereign immunity for suits against the United States seeking nonmonetary relief, even if the claim does not arise under the APA.").

23. Plaintiffs seek only declaratory and injunctive relief, quintessentially non-monetary relief. Section 702 therefore waives sovereign immunity as to the relief requested herein.

## STATEMENT OF FACTS

### A. Common Facts

24. The provisions of Section 380.707(a) state "[t]raining providers must require all accepted applicants for behind-the-wheel (BTW) training to certify that they will comply with U.S. Department of Transportation regulations in parts 40, 382, 383, and 391, as well as State and/or local laws, related to controlled substances testing, age, medical certification, licensing, and driving record. Training providers must verify that all accepted BTW applicants or Class A theory instruction upgrade curriculum applicants hold a valid commercial learner's permit or commercial driver's license, as applicable."

25. FMCSA's reliance on the provisions of Section 380.707(a) fails as a predicate for two independent reasons — first, the certification duty in the first sentence runs only to "accepted applicants for behind-the-wheel (BTW) training." No Plaintiff accepts applicants for behind-the-wheel training. Section 380.707(c) expressly permits theory and behind-the-wheel training to be delivered by separate providers. Second, even for a provider that does offer behind-the-wheel training, § 380.707(a) imposes no English-proficiency duty at all. The first sentence requires the trainee to certify that he will comply in the future, and it enumerates the subjects: controlled

substances testing, age, medical certification, licensing, and driving record. English language proficiency is not among them. The second sentence states the only affirmative verification a provider must perform, and it is a single check — that the applicant holds a valid commercial learner's permit or commercial driver's license.

26. So, the regulation FMCSA relies on for the proposition that these Plaintiffs should have screened their students for English proficiency does not require any provider, of any kind, to screen any student for English proficiency.

27. Nor has FMCSA ever announced any such requirement, or any method by which an online theory provider could meet it. Due process requires that "regulated parties should know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

28. The curriculum requirement FMCSA invokes is also narrower than the Notices describe. Paragraph 6.b of each Notice states that the Class A and Class B curricula require instruction on the ELP requirements "and the consequences for ELP violations." Appendix A, Unit A1.5.6, which governs Class A, contains no requirement to teach the consequences of ELP violations. Its English-proficiency sentence provides that "[d]river-trainees who are not English speakers must be instructed in FMCSA English language proficiency requirements." A separate sentence requires instruction on "the impact that violating Federal and state regulations has on their driving records and their employing motor carrier's records." The phrase "and the consequences for violations" appears only in Appendix B, Unit B1.5.6, which governs Class B. Neither appendix prescribes any particular wording.

29. The three Notices of Emergency Removal are the same document. Apart from each provider's name, address, UPS tracking number, TPR identifier, and the number of drivers listed, they are identical word for word: the same legal basis, the same findings at paragraphs 6.a through 6.n and 7.a through 7.c, and the same five crash narratives, none of which involves a driver trained by any Plaintiff.

30. Plaintiffs' removals were among the 103 emergency removals that the FMCSA executed on the afternoon of August 31, 2026, in a span of six hours and eleven minutes, at an

average interval of 3.6 minutes per removal. Before that day, only six emergency removals existed in the entire history of the TPR.

31. The pace and scale of the mass removal action are inconsistent with any individualized determination that each of the 103 providers, including the Plaintiffs, posed an imminent threat to public safety requiring emergency action.

32. Moreover, every inspection in the datasets relied upon in the Notices of Emergency Removal occurred on or after June 25, 2025—the date on which English language proficiency failure first became an out-of-service condition. *See* Commercial Vehicle Safety Alliance, Non-Compliance with English Language Proficiency Regulation Takes Effect as an Out-of-Service Driver Violation (June 25, 2025), available at https://cvsa.org/news/elp-oosc-06252025/. The FMCSA thus applied the consequences of a new enforcement policy retroactively to training that Plaintiffs completed and reported before that policy took effect, when English-proficiency noncompliance was not an out-of-service condition.

33. A total of 164 trainees (95.9%) identified in the data set relied on by the FMCSA for the removal action were certified by CDL Direct prior to June 25, 2025. Likewise, a total of 57 trainees (93.4%) were certified by ELDT Direct prior to June 25, 2025, and 64 trainees (71.1%) were certified by ELDT Chimp prior to that date.

34. The temporal gaps between training and inspection are enormous. The median gap between training and inspection for trainees certified by CDL Direct is 588 days, for trainees certified by ELDT Direct 445 days, and for trainees certified by ELDT Chimp more than 200 days. The longest intervals are 1,593 days, 1,480 days, and 533 days respectively.

35. Section 380.723(e) itself limits retroactive consequences. It provides that FMCSA "reserves the right to retroactively invalidate training" only "[i]n instances of fraud or other criminal behavior by a training provider in which driver-trainees have knowingly participated." None of the Notices alleges fraud or criminal behavior by any Plaintiff, or knowing participation by any driver-trainee.

**B. CDL Direct's Online Theory-Only Operations**

36. CDL Direct's Class A and Class B offerings are online theory courses only. Its course catalog describes each as an online theory course and states that, after completion is reported, the student may begin behind-the-wheel training with a separate school. The courses themselves conclude by telling the student that the ELDT theory completion has been submitted to the registry and that the student must attend an approved behind-the-wheel training school to continue. CDL Direct does not provide behind-the-wheel training.

37. CDL Direct delivers asynchronous online theory instruction. A student purchases access and completes the coursework remotely, at a time and place of the student's choosing, without any live interaction with an instructor. No provision of 49 C.F.R. Part 380 requires an online theory provider to verify the identity of a remote student, to conduct a live interview, or to assess a student's spoken English. FMCSA has never issued any guidance, instrument, or standard by which an online theory provider could perform such an assessment. The Notice of Emergency Removal nonetheless faults CDL Direct for failing to detect a condition that FMCSA itself assesses only through a live roadside interview conducted in person by a trained inspector.

38. That distinction matters under the governing regulations. Section 380.707(a)'s attestation obligation applies to applicants accepted for behind-the-wheel training, and § 380.707(c) permits theory and behind-the-wheel training to be delivered by separate providers. A theory-completion report under § 380.717 does not certify driver qualification.

**C. The August 31, 2026 Notice to CDL Direct and Its Evidentiary Basis**

39. On August 31, 2026, FMCSA issued a Notice of Emergency Removal that shut down CDL Direct's operations effective immediately. The purported ground was the English language proficiency of CDL Direct's graduates. CDL Direct's TPR ID is c17496f2-02fb-4ade-a130-840f33386489. A copy of the Notice of Emergency Removal is attached hereto as **Composite Exhibit A.**

40. Under 49 C.F.R. § 380.717(b), the certification information a provider transmits through the Registry must identify the "type of training (theory and/or BTW) the driver-trainee completed." Each of the approximately 36,000 completions CDL Direct reported was transmitted

as theory training. The audit described at paragraph 6.f of the Notice was conducted, in FMCSA's words, "using data available in FMCSA's systems." Every record FMCSA examined therefore identified on its face that CDL Direct had delivered theory training and not behind-the-wheel training. FMCSA nonetheless premised the Notice on obligations that apply only to providers of behind-the-wheel training.

41. The Notice of Emergency Removal regarding CDL Direct enclosed a spreadsheet of 171 driver-trainee records as FMCSA's evidentiary basis. Those 171 drivers amount to fewer than 0.5 percent of approximately 36,000 distinct students whose successful theory completions CDL Direct reported to the TPR during the period covered by the spreadsheet.

42. Four entries in the spreadsheet show the inspection or citation date before the reported training date: report numbers 000P15MMX5, 4248130054, 3943000922, and W112007150. Paragraph 6.h of the Notice defines FMCSA's dataset as driver-trainees "cited for one or more ELP violation(s) after" the provider certified that they had completed training. These four records do not meet FMCSA's own criterion. Their inclusion calls into question the reliability of the entire dataset.

43. The spreadsheet contains no driver-specific evidence of English proficiency at the time of reporting, no denominator, no rate, no violation-code analysis, and no disposition analysis. It also does not identify the course, class, training type, or out-of-service status for any driver.

44. The representative inspection reports enclosed with the Notice of Emergency Removal as to CDL Direct vary materially. Report PAN303518931 records the ELP violation as not out of service. Report KSHP02951056 reflects failure only of the sign-recognition step and notes "Driver seemed to mostly be able to understand us."

### D. CDL Direct's Curriculum and Regulatory Distinctions

45. Both the Class A and Class B curricula teach and test the English language proficiency requirement. Each quotes the 49 C.F.R. § 391.11(b)(2) standard verbatim, instructs that a driver must speak English during a roadside inspection, asks, "Which language(s) can you expect to use during an inspection?", and retests the same objective in the Unit 5 assessment.

46. The same units teach the consequences of violations, including fines; driver and vehicle out-of-service orders; harm to driver and carrier safety scores; and disqualification for up to one year for violating an out-of-service order.

47. The ELP instruction is not new. CDL Direct's stored course-definition records show that the ELP standard, the English-inspection instruction, and the ELP knowledge checks appear in every stored version of both courses, versions 1 through 6, beginning January 7, 2022 for Class A and February 7, 2022 for Class B. The substance of the instruction did not change, and it predates FMCSA's 2025–2026 ELP enforcement initiative by more than three years.

48. A theory-completion report under § 380.717 certifies completion of the required theory training, not driver qualification under § 391.11(b)(2). Section 380.707(a)'s compliance attestation applies to applicants accepted for behind-the-wheel training, while § 391.11(b)(2) places the English-proficiency qualification obligation on the driver and employing motor carrier. CDL Direct's completion report therefore does not represent that it administered a roadside English-proficiency assessment or guaranteed a driver's later performance.

**E. No Willful Disregard or Genuine Emergency**

49. The Notice's crash narratives concern drivers who are not alleged to have trained with CDL Direct. The Notice itself states that "the fact that these crashes occurred is not a basis for this Emergency Removal."

50. The record does not support willful disregard. CDL Direct's ELP instruction and testing have been in every stored course version since early 2022. The Notice identifies no prior warning, audit finding, corrective direction, or refusal to correct, and its willfulness analysis rests in part on obligations applicable to behind-the-wheel providers rather than to CDL Direct's theory-only operation.

51. CDL Direct's Class A course satisfies Unit A1.5.6, which contains no ELP-specific consequences requirement, and its Class B course teaches the consequences for violations that Unit B1.5.6 requires, as set out in paragraph 46.

52. No genuine emergency existed. The Notice does not rely on any crash involving a CDL Direct trainee, identifies no imminent risk from any current trainee, and rests on a retrospective data match subject to the validation concerns described above. Any curriculum concern FMCSA may have can be addressed through the ordinary corrective-action process of § 380.723(b)–(c) without nationwide cessation of operations. In its § 380.723(d) request, CDL Direct offered to make immediately any clarifying change FMCSA identifies, without conceding any deficiency.

53. CDL Direct received no notice of proposed removal under § 380.723(b), no pre-deprivation notice of the English-proficiency ground, and no opportunity to respond before removal.

**F. Harm to CDL Direct**

54. The emergency removal has shut down CDL Direct's online theory-training operations entirely. CDL Direct's students cannot complete or receive credit for their theory training, its staff face layoffs, and the business faces permanent closure. As of August 31, 2026, 16,627 students were enrolled and mid-program. CDL Direct has been unable to certify any of them. It employs seven staff members which are shared with ELDT Direct and ELDT Chimp, and its monthly fixed obligations are approximately $57,569.00.

**G. ELDT Direct's Online Theory-Only Operations**

55. ELDT Direct's Class A and Class B offerings are online theory courses only. Its public catalog describes each as an online theory course and states that, after completion is reported, the student may begin behind-the-wheel training with a separate school. ELDT Direct does not provide behind-the-wheel training.

56. That distinction matters under the governing regulations. Section 380.707(a)'s attestation obligation applies to applicants accepted for behind-the-wheel training, § 380.707(c) permits theory and behind-the-wheel training to be delivered by separate providers, and § 380.717 governs the reporting of theory completion. A theory-completion report under § 380.717 does not certify driver qualification.

57. The courses themselves conclude by telling the student that the ELDT theory completion has been submitted to the registry and that the student must attend an approved behind-

the-wheel training school to continue. Like CDL Direct, ELDT Direct delivers asynchronous online instruction, without live interaction with an instructor, and no provision of 49 C.F.R. Part 380 requires it to verify a remote student's identity or assess a student's spoken English.

**H. The August 31, 2026 Notice and Its Evidentiary Basis as to ELDT Direct**

58. On August 31, 2026, FMCSA issued a Notice of Emergency Removal to ELDT Direct, shutting down its operations effective immediately. ELDT Direct's TPR ID is f371c61f-b378-400d-b319-f69c760c4b2d. A copy of the Notice of Emergency Removal is attached hereto as **Composite Exhibit B**.

59. The Notice enclosed a spreadsheet identifying 61 drivers cited for English-language-proficiency violations after ELDT Direct reported their training. Those 61 drivers amount to approximately 2 percent of the roughly 2,900 distinct students whose successful theory completions ELDT Direct reported to the TPR during the period covered by the spreadsheet. Each of those completions was transmitted to the Registry as theory training under § 380.717(b).

60. One entry in the spreadsheet shows the inspection date more than five months before the reported training date: report no. 0378001927. That record does not meet the criterion FMCSA itself stated at paragraph 6.h of the Notice, and its inclusion calls into question the reliability of the dataset.

61. The spreadsheet contains no driver-specific evidence of English proficiency at the time of reporting, no denominator, no rate, no violation-code analysis, and no disposition analysis. It also does not identify the course, class, training type, out-of-service status, or disposition for any driver.

**I. ELDT Direct's Curriculum and Regulatory Distinctions**

62. Both the Class A and Class B curricula teach and test the English language proficiency requirement. The ELP standard, the English-inspection instruction, and the ELP knowledge checks appear in every stored version of both courses, versions 1 through 6, beginning January 7, 2022 for Class A and February 7, 2022 for Class B.

63. The courses quote the 49 C.F.R. § 391.11(b)(2) standard verbatim, instruct that a driver must speak English during a roadside inspection, test comprehension with inspection-related questions, and teach the consequences of violations, including fines, out-of-service orders, effects on safety scores, and disqualification for violating an out-of-service order.

64. ELDT Direct's Class A course satisfies Unit A1.5.6, which contains no ELP-specific consequences requirement, and its Class B course teaches the consequences for violations that Unit B1.5.6 requires, as set out in paragraph 63.

65. A theory-completion report under § 380.717 certifies completion of the required theory training, not driver qualification under § 391.11(b)(2). ELDT Direct's completion report therefore does not represent that it administered a roadside English-proficiency assessment or guaranteed a driver's later performance.

**J. No Willful Disregard or Genuine Emergency as to ELDT Direct**

66. The Notice's crash narratives concern drivers not alleged to have trained with ELDT Direct. The record does not support willful disregard: ELP instruction has been in every course version since early 2022, and the Notice identifies no prior warning or audit finding.

67. No genuine emergency existed. The Notice does not rely on any crash involving an ELDT Direct trainee, identifies no imminent risk from any current trainee, and the removal rests on a retrospective data match subject to the validation concerns described above. Any curriculum concern FMCSA may have can be addressed through the ordinary corrective-action process of § 380.723(b)–(c) without nationwide cessation of operations. In its § 380.723(d) request, ELDT Direct offered to make immediately any clarifying change FMCSA identifies, without conceding any deficiency.

68. ELDT Direct received no notice of proposed removal under § 380.723(b), no pre-deprivation notice of the English-proficiency ground, and no opportunity to respond before removal.

**K. Harm to ELDT Direct**

69. The emergency removal has shut down ELDT Direct's online theory-training operations entirely. ELDT Direct's students cannot complete or receive credit for their theory training, its staff face layoffs, and the business faces permanent closure. As of August 31, 2026, 656 students were enrolled and mid-program. ELDT Direct has been unable to certify any of them. ELDT Direct employs seven staff members which are shared with CDL Direct and ELDT Chimp, and its monthly fixed obligations are approximately $57,569.00.

**L. ELDT Chimp's Online Theory-Only Operations**

70. ELDT Chimp's Class A and Class B offerings are online theory courses only. Its course catalog describes each as an online theory course and states that, after completion is reported, the student must complete behind-the-wheel training with a separate school. ELDT Chimp does not provide behind-the-wheel training.

71. ELDT Chimp delivers asynchronous online theory instruction. A student purchases access and completes the coursework remotely, at a time and place of the student's choosing, without any live interaction with an instructor. No provision of 49 C.F.R. Part 380 requires an online theory provider to verify the identity of a remote student, to conduct a live interview, or to assess a student's spoken English, and FMCSA has never issued any guidance, instrument, or standard by which an online theory provider could perform such an assessment.

**M. The August 31, 2026 Notice to ELDT Chimp and Its Evidentiary Basis**

72. On August 31, 2026, FMCSA issued a Notice of Emergency Removal to ELDT Chimp, shutting down its operations effective immediately. ELDT Chimp's TPR ID is 21e2f72d-f2bd-4fe2-b2ba-3825210ec053. A copy of the Notice of Emergency Removal is attached hereto as **Composite Exhibit C**.

73. The Notice is addressed to ELDT Chimp at 389 Palm Coast Parkway SW, Suite 4, Palm Coast, Florida, and states that it was delivered by UPS (tracking number 1ZA476E6NT93701165) and by electronic mail to Admin@ELDTchimp.com. Its certificate of service is dated August 31, 2026.

74. Under 49 C.F.R. § 380.717(b), each of the approximately 90 completions ELDT Chimp reported to the Registry was transmitted as theory training. Every record FMCSA examined therefore identified on its face that ELDT Chimp had delivered theory training and not behind-the-wheel training.

75. The Notice enclosed a spreadsheet of 90 driver-trainee records as FMCSA's evidentiary basis. Those 90 drivers amount to approximately .72 percent of the approximately 12,500 distinct students whose theory completions ELDT Chimp reported to the TPR during the period covered by the spreadsheet.

76. Six entries in the spreadsheet show the inspection date before the reported training date: report numbers SPQNI03427, 1234610046, 4391001105, 7FQ79DDK58, W192003305, and 1232005125. In one, the inspection preceded the training by more than five months. These six records do not meet the criterion FMCSA itself stated at paragraph 6.h of the Notice and their inclusion calls into question the reliability of the dataset.

77. FMCSA enclosed ten inspection reports as a "representative sample." Two of those ten — report FL4391001105 (inspection January 30, 2026; training February 24, 2026) and report CO1234610046 (inspection July 17, 2025; training December 26, 2025) — concern drivers inspected before ELDT Chimp trained them.

78. The spreadsheet contains no driver-specific evidence of English proficiency at the time of reporting, no denominator, no rate, no violation-code analysis, and no disposition analysis. It also does not identify the course, class, training type, or out-of-service status for any driver.

**N. ELDT Chimp's Curriculum and Regulatory Distinctions**

79. ELDT Chimp's Class A and Class B curricula include, in Unit A1.5.6 and Unit B1.5.6 (External Communications), instruction on the FMCSA English language proficiency requirements, including the 49 C.F.R. § 391.11(b)(2) standard and the expectation that a driver communicate in English during a roadside inspection, and test that instruction.

80. ELDT Chimp's Class B course teaches the consequences of violations found at inspection, including fines, out-of-service orders, and effects on safety records, and that this

instruction has been in every version of the courses since ELDT Chimp was listed on the Registry on September 25, 2024.

81. A theory-completion report under § 380.717 certifies completion of the required theory training, not driver qualification under § 391.11(b)(2). ELDT Chimp's completion report therefore does not represent that it administered a roadside English-proficiency assessment or guaranteed a driver's later performance.

### O. No Willful Disregard or Genuine Emergency as to ELDT Chimp

82. The Notice's crash narratives concern drivers not alleged to have trained with ELDT Chimp, and the Notice expressly states that "the fact that these crashes occurred is not a basis for this Emergency Removal." The Notice does not rely on any crash involving a driver trained by ELDT Chimp.

83. The record does not support willful disregard. Before August 31, 2026, ELDT Chimp received no warning, audit finding, inquiry, or corrective direction from FMCSA concerning English language proficiency or any other matter. The Notice identifies none, and its willfulness analysis rests on obligations applicable to behind-the-wheel providers rather than to ELDT Chimp's theory-only operation.

84. No genuine emergency existed. The Notice identifies no imminent risk from any current ELDT Chimp trainee and rests on a retrospective data match subject to the validation defects described above. Any concern FMCSA had could have been addressed through the ordinary process of § 380.723(b) and (c).

85. ELDT Chimp received no notice of proposed removal under § 380.723(b), no pre-deprivation notice of the English-proficiency ground, and no opportunity to respond before removal.

### P. Harm to ELDT Chimp

86. The emergency removal has shut down ELDT Chimp's online theory-training operations entirely. ELDT Chimp's students cannot complete or receive credit for their theory training, its staff face layoffs, and the business faces permanent closure. As of August 31, 2026,

2,520 students were enrolled and mid-program. ELDT Chimp has been unable to certify any of them. It employs seven staff members which are shared with CDL Direct and ELDT Direct, and its monthly fixed obligations are approximately $57,569.00.

**COUNT I – VIOLATION OF THE FIFTH AMENDMENT—PROCEDURAL DUE PROCESS**
**(CDL Direct, LLC)**

87. CDL Direct incorporates by reference all of the allegations in paragraphs 1–6 and 11–54 above in support of its claim for violation of the Fifth Amendment to the United States Constitution against the Defendants as if fully set forth herein.

88. CDL Direct possesses a constitutionally protected property interest in its listing on the TPR.

89. The Supreme Court has held that a license whose continued possession is essential to the pursuit of a livelihood is a constitutionally protected property interest. *See Bell v. Burson*, 402 U.S. 535, 539 (1971).

90. CDL Direct's TPR listing is the functional equivalent of a professional license. Without it, CDL Direct cannot lawfully provide online theory training or report theory completions. The listing is essential to CDL Direct's livelihood and to the continued operation of its business.

91. Defendants have deprived CDL Direct of its constitutionally protected property interest without constitutionally adequate process. The three-factor balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), requires consideration of: (1) the private interest affected; (2) the risk of an erroneous deprivation through the procedures used, and the probable value of additional safeguards; and (3) the government's interest, including the fiscal and administrative burden of additional process.

92. The "root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). CDL Direct was given none.

93. The private interest is overwhelming. The emergency removal has completely shut down CDL Direct's online theory-only operations. CDL Direct cannot provide Class A or Class B

theory training, cannot report completions, and faces permanent closure. Students cannot complete their training and staff face layoffs.

94. The regulatory framework provides no assured prompt post-deprivation hearing or decision. Section 380.723(d) gives a provider thirty days to request review, provides only that FMCSA "may ask" the provider to attend a conference, and sets no deadline for a hearing, no deadline for a decision, and no stay or interim relief. CDL Direct therefore has no assured date on which it will be heard or answered while the removal operates in full force.

95. Where an agency summarily suspends or withdraws a license without a prior hearing, the Due Process Clause requires at a minimum that the licensee be assured a prompt post-deprivation hearing and a prompt decision. *See Barry v. Barchi*, 443 U.S. 55 (1979).

96. The contrast with the scheme the Supreme Court upheld in *FDIC v. Mallen*, 486 U.S. 230 (1988), is instructive. There the statute required a hearing within 30 days of a request and a decision within 60 days after the hearing, so that the suspended party was assured a decision within 90 days. *Id.* at 243. Section 380.723 assures nothing comparable.

97. Section 380.723 is defective in precisely that respect. It does not require a hearing at all; it provides only that FMCSA "may ask" the provider to attend a conference. It fixes no date by which any conference or hearing must occur, no deadline by which FMCSA must decide, and no stay or interim relief of any kind.

98. On September 1, 2026, the day after its removal, CDL Direct submitted a written request for administrative review under 49 C.F.R. § 380.723(d). As of the filing of this Complaint, FMCSA has not acknowledged that request, has not asked CDL Direct to attend a conference, has not scheduled any proceedings, has not issued any decision, and has not identified any date by which it will do so. CDL Direct has remained shut down throughout that period. The regulation supplies no deadline that would change this, and no stay or interim relief of any kind.

99. The consequence is that CDL Direct is suffering the entire penalty—the closure of its online theory business—before any opportunity to contest FMCSA's proof.

100. The deprivation is total rather than partial. Removal from the Registry eliminates CDL Direct's lawful theory-training business because a provider not listed on the Registry may not deliver entry-level driver training or certify driver-trainees. The penalty is complete from the first day.

101. The risk of erroneous deprivation is extreme. FMCSA relied on 171 records out of approximately 36,000 reported theory completions, without a denominator, rate, driver-specific evidence, violation-code analysis, or disposition analysis. Four records are chronologically impossible, representative inspection reports materially differ, and the Notice identifies no evidence that any cited driver was deficient when CDL Direct reported completion. CDL Direct also received no pre-deprivation notice of the English-proficiency ground.

102. The operative ground for removal was never communicated to CDL Direct before the emergency removal itself. CDL Direct received no notice of proposed removal, no statement of the English-proficiency ground, and no opportunity to respond or correct.

103. The government's interest does not justify dispensing with due process. The Notice does not rely on any crash involving a CDL Direct trainee, identifies no imminent risk from any current trainee, and identifies no validated provider-specific emergency. Less drastic alternatives were available, including notice, an opportunity to respond, corrective action, and interim monitoring.

104. As a direct result of the Defendants' actions, CDL Direct has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

## COUNT II – ULTRA VIRES AGENCY ACTION
**(CDL Direct, LLC)**

105. CDL Direct incorporates by reference all of the allegations in paragraphs 1–6, 11–54, and 88–104 above in support of its claim for ultra vires agency action against the Defendants as if fully set forth herein.

106. Both the Notice of Emergency Removal and the agency's action identify 49 U.S.C. § 31305(c)(5) as statutory authority. That provision directs the Secretary to establish final

regulations and a process by which providers demonstrate compliance; it does not itself confer authority to remove a provider in an individual adjudication or emergency.

107. Section 31305(c)(5) is a rulemaking directive. The process the Secretary established pursuant to that command is codified at 49 C.F.R. § 380.723. Its ordinary course, set out at § 380.723(b) and (c), requires a notice of proposed removal, an opportunity to respond, and an opportunity to take corrective action before removal becomes effective. Section 380.723(e) permits FMCSA to depart from that course only where the enumerated emergency predicates are present. Absent those predicates, subsections (b) and (c) supply the only lawful path to removal.

108. In removing CDL Direct without commencing the process required by § 380.723(b) and (c), and without any of the predicates that § 380.723(e) requires for departing from it, FMCSA acted outside the only authority Congress conferred and outside the only process the Secretary established under it. CDL Direct never received any prior notice or investigation concerning the ground relied upon for removal.

109. Independently, an agency is bound by its own regulations for so long as they remain in force and may not depart from them in an individual case. *Accardi v. Shaughnessy*, 347 U.S. 260 (1954). FMCSA disregarded the procedure its own regulation prescribes when it removed CDL Direct without the notice, response, and corrective-action process.

110. Section 380.723(e) permits emergency removal only in cases of "fraud, criminal behavior, or willful disregard of the regulations in this subpart or in which public health, interest, or safety requires." None of those predicates is met as to CDL Direct.

111. The Notice's stated legal basis is inapplicable to CDL Direct on its own terms. Paragraph 6.d of the Notice invokes 49 C.F.R. § 380.707(a), which by its express language governs "all accepted applicants for behind-the-wheel (BTW) training." Paragraph 6.i rests its finding on "the requirement that driver trainees receiving BTW training certify that they will meet FMCSA's driver qualifications." Paragraph 6.l defines material deficiency in part by reference to a provider that "delivers BTW training." Paragraph 7.a rests the willfulness finding on the same behind-the-wheel obligations. CDL Direct delivers no behind-the-wheel training, accepts no applicants for behind-the-wheel training, and is recorded in FMCSA's own Registry as offering neither range

nor public-road instruction. Each of these predicates is therefore inapplicable to CDL Direct as a matter of law.

112. The Notice itself states the obligations it relies on. At paragraph 6.k, FMCSA states that its regulations "do require training providers to provide theory instruction about ELP and require BTW driver-trainees to certify they will comply with the qualification standards, including ELP." The first obligation is an obligation to instruct. The second attaches only to behind-the-wheel trainees. CDL Direct delivers no behind-the-wheel training. On the Notice's own statement of the law, the only obligation that applied to CDL Direct was to provide theory instruction about English language proficiency, and CDL Direct did so in every version of both of its courses.

113. Paragraph 6.d of the Notice paraphrases § 380.707(a) as requiring a certification of compliance with "FMCSA's driver qualification regulations in 49 CFR Part 391." The regulation contains no such requirement. It requires a certification of compliance with the listed parts only as "related to controlled substances testing, age, medical certification, licensing, and driving record." The Notice's paraphrase omits that limitation, and only by omitting it can the certification be read to reach English language proficiency.

114. Independently, 49 C.F.R. § 380.707(a) imposes no English-language-proficiency screening obligation on any training provider. The certification it requires is a trainee's certification of prospective compliance concerning controlled substances testing, age, medical certification, licensing, and driving record. The only verification it requires of a provider is that an applicant hold a valid commercial learner's permit or commercial driver's license. No provision of 49 C.F.R. Part 380 requires a training provider to assess, verify, or attest to a driver-trainee's English language proficiency.

115. No fraud has been alleged against CDL Direct. The Notice of Emergency Removal does not allege that CDL Direct engaged in fraud.

116. No criminal behavior has been alleged against CDL Direct. The Notice of Emergency Removal does not allege that CDL Direct engaged in criminal behavior.

117. Willful disregard has not been and cannot be established. CDL Direct taught and tested ELP in every stored version of its Class A and Class B courses since early 2022. The Notice

identifies no prior warning, audit finding, corrective direction, or refusal to correct. And 164 of the 171 drivers completed CDL Direct's course before June 25, 2025, when English-proficiency noncompliance first became an out-of-service condition.

118. Paragraph 6.l of the Notice of Emergency Removal defines a material deficiency in two ways only: theory curriculum that fails adequately to instruct non-English-speaking driver-trainees about ELP requirements, and the delivery of behind-the-wheel training to drivers who certify compliance and do not meet the ELP standard. Paragraph 6.m finds neither. It makes no finding that CDL Direct's curriculum failed to instruct on ELP requirements, and CDL Direct delivers no behind-the-wheel training. What paragraph 6.m finds instead is that CDL Direct certified the completion of theory training by drivers later cited for ELP violations. That is not a material deficiency under the Notice's own definition.

119. No genuine emergency existed. The Notice does not rely on any crash involving a CDL Direct trainee, identifies no imminent risk from any current trainee, and relies on a retrospective data match with validation defects. Any curriculum concern could have been addressed through § 380.723(b)–(c), not immediate nationwide cessation of CDL Direct's operations.

120. Federal agencies possess only the authority Congress has conferred upon them, and a federal district court has jurisdiction over an original suit to set aside agency action taken in excess of the agency's delegated powers. *See Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (an agency's "power to act and how [it is] to act" are "authoritatively prescribed by Congress").

121. Because the statutory predicates for emergency removal under 49 C.F.R. § 380.723(e) were not met, Defendants acted beyond the scope of their delegated authority with respect to CDL Direct.

122. As a direct result of Defendants' actions, CDL Direct has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

**COUNT III – REQUEST FOR EMERGENCY INJUNCTIVE RELIEF**
**(CDL Direct, LLC)**

123. CDL Direct incorporates by reference all the allegations in paragraphs 1–6, 11–54, 88–104, and 106–122 above in support of its claim for emergency injunctive relief against the Defendants as if fully set forth herein.

124. CDL Direct seeks a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) and a preliminary mandatory injunction pursuant to Federal Rule of Civil Procedure 65(a), restoring CDL Direct's listing on the TPR pending final resolution of this action.

125. A plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008); *see also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*).

126. CDL Direct is likely to succeed on the merits of both Count I and Count II. It is an online theory-only provider; FMCSA relied on 171 records out of approximately 36,000 reported theory completions; four records are chronologically impossible; the Notice supplies no driver-specific proof of proficiency at reporting; and CDL Direct received no pre-deprivation notice of the English-proficiency ground. The longstanding ELP instruction and testing in both courses further undermine FMCSA's findings of noncompliance and willful disregard.

127. Absent injunctive relief, CDL Direct will suffer irreparable harm. The emergency removal has completely shut down its online theory operations. CDL Direct cannot provide Class A or Class B theory training, cannot report completions, cannot earn revenue, and faces permanent closure. The loss of students, staff, goodwill, and market position cannot be recovered.

128. Because Defendants are agencies and an officer of the United States, and because the United States' waiver of immunity under 5 U.S.C. § 702 extends only to relief other than money damages, no action for damages lies against Defendants for the losses described above. CDL Direct has no statutory damages remedy for the revenue, enterprise value, or goodwill it loses each day the removal remains in effect. The injury is therefore irreparable and legally uncompensable.

*See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013) (economic loss that cannot be recovered because of sovereign immunity is irreparable).

129. The balance of equities tips decisively in CDL Direct's favor. Where the Government is the opposing party, the balance of harms and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). CDL Direct faces total destruction of its online theory business, while Defendants face at most a temporary administrative inconvenience. FMCSA can continue to monitor CDL Direct's compliance while this litigation proceeds. The balance of total business destruction against temporary administrative inconvenience is not close.

130. An injunction serves the public interest. The public interest favors lawful agency action, constitutional due process, accurate regulatory enforcement, and maintaining available theory-training capacity for commercial drivers. Restoring CDL Direct pending lawful review does not undermine public safety; it preserves training access while permitting FMCSA to address any curriculum concern through the ordinary corrective-action process.

131. As a direct result of Defendants' actions, CDL Direct has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

## COUNT IV – VIOLATION OF THE FIFTH AMENDMENT—PROCEDURAL DUE PROCESS
**(ELDT Direct, LLC)**

132. ELDT Direct incorporates by reference all of the allegations in paragraphs 1–4, 7–8, 11–35, and 55–69 above in support of its claim for violation of the Fifth Amendment to the United States Constitution against the Defendants as if fully set forth herein.

133. ELDT Direct possesses a constitutionally protected property interest in its listing on the TPR.

134. The Supreme Court has held that a license whose continued possession is essential to the pursuit of a livelihood is a constitutionally protected property interest. *See Bell v. Burson*, 402 U.S. 535, 539 (1971).

135. ELDT Direct's TPR listing is the functional equivalent of a professional license. Without it, ELDT Direct cannot lawfully provide online theory training or report theory completions. The listing is essential to ELDT Direct's livelihood and to the continued operation of its business.

136. Defendants have deprived ELDT Direct of its constitutionally protected property interest without constitutionally adequate process. The three-factor balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), requires consideration of: (1) the private interest affected; (2) the risk of an erroneous deprivation through the procedures used, and the probable value of additional safeguards; and (3) the government's interest, including the fiscal and administrative burden of additional process.

137. The "root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). ELDT Direct was given none.

138. The private interest is overwhelming. The emergency removal has completely shut down ELDT Direct's online theory-only operations. ELDT Direct cannot provide Class A or Class B theory training, cannot report completions, and faces permanent closure. Students cannot complete their training and staff face layoffs.

139. The regulatory framework provides no assured prompt post-deprivation hearing or decision. Section 380.723(d) gives a provider thirty days to request review, provides only that FMCSA "may ask" the provider to attend a conference, and sets no deadline for a hearing, no deadline for a decision, and no stay or interim relief. ELDT Direct therefore has no assured date on which it will be heard or answered while the removal operates in full force.

140. Where an agency summarily suspends or withdraws a license without a prior hearing, the Due Process Clause requires at a minimum that the licensee be assured a prompt post-deprivation hearing and a prompt decision. *See Barry v. Barchi*, 443 U.S. 55 (1979).

141. The contrast with the scheme the Supreme Court upheld in *FDIC v. Mallen*, 486 U.S. 230 (1988), is instructive. There the statute required a hearing within 30 days of a request and a

decision within 60 days after the hearing, so that the suspended party was assured a decision within 90 days. *Id.* at 243. Section 380.723 assures nothing comparable.

142. Section 380.723 is defective in precisely that respect. It does not require a hearing at all; it provides only that FMCSA “may ask” the provider to attend a conference. It fixes no date by which any conference or hearing must occur, no deadline by which FMCSA must decide, and no stay or interim relief of any kind.

143. On September 1, 2026, the day after its removal, ELDT Direct submitted a written request for administrative review under 49 C.F.R. § 380.723(d). As of the filing of this Complaint, FMCSA has not acknowledged that request, has not asked ELDT Direct to attend a conference, has not scheduled any proceeding, has not issued any decision, and has not identified any date by which it will do so. ELDT Direct has remained shut down throughout that period. The regulation supplies no deadline that would change this, and no stay or interim relief of any kind.

144. The consequence is that ELDT Direct is suffering the entire penalty—the closure of its online theory business—before any opportunity to contest FMCSA’s proof.

145. The deprivation is total rather than partial. Removal from the Registry eliminates ELDT Direct’s lawful theory-training business because a provider not listed on the Registry may not deliver entry-level driver training or certify driver-trainees. The penalty is complete from the first day.

146. The risk of erroneous deprivation is extreme. FMCSA relied on 61 records out of approximately 2,900 reported theory completions, without a denominator, rate, driver-specific evidence, violation-code analysis, or disposition analysis. One record is chronologically impossible, and the Notice identifies no evidence that any cited driver was deficient when ELDT Direct reported completion. ELDT Direct also received no pre-deprivation notice of the English-proficiency ground.

147. The operative ground for removal was never communicated to ELDT Direct before the emergency removal itself. ELDT Direct received no notice of proposed removal, no statement of the English-proficiency ground, and no opportunity to respond or correct.

148. The government's interest does not justify dispensing with due process. The Notice does not rely on any crash involving an ELDT Direct trainee, identifies no imminent risk from any current trainee, and identifies no validated provider-specific emergency. Less drastic alternatives were available, including notice, an opportunity to respond, corrective action, and interim monitoring.

149. As a direct result of the Defendants' actions, ELDT Direct has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

**COUNT V – ULTRA VIRES AGENCY ACTION**
**(ELDT Direct, LLC)**

150. ELDT Direct incorporates by reference all of the allegations in paragraphs 1–4, 7–8, 11–35, 55–69, and 133–149 above in support of its claim for ultra vires agency action against the Defendants as if fully set forth herein.

151. Both the Notice of Emergency Removal and the agency's action identify 49 U.S.C. § 31305(c)(5) as statutory authority. That provision directs the Secretary to establish final regulations and a process by which providers demonstrate compliance; it does not itself confer authority to remove a provider in an individual adjudication or emergency.

152. Section 31305(c)(5) is a rulemaking directive. The process the Secretary established pursuant to that command is codified at 49 C.F.R. § 380.723. Its ordinary course, set out at § 380.723(b) and (c), requires a notice of proposed removal, an opportunity to respond, and an opportunity to take corrective action before removal becomes effective. Section 380.723(e) permits FMCSA to depart from that course only where the enumerated emergency predicates are present. Absent those predicates, subsections (b) and (c) supply the only lawful path to removal.

153. In removing ELDT Direct without commencing the process required by § 380.723(b) and (c), and without any of the predicates that § 380.723(e) requires for departing from it, FMCSA acted outside the only authority Congress conferred and outside the only process the Secretary established under it. ELDT Direct never received any prior notice or investigation concerning the ground relied upon for removal.

154. Independently, an agency is bound by its own regulations for so long as they remain in force and may not depart from them in an individual case. *Accardi v. Shaughnessy*, 347 U.S. 260 (1954). FMCSA disregarded the procedure its own regulation prescribes when it removed ELDT Direct without the notice, response, and corrective-action process.

155. Section 380.723(e) permits emergency removal only in cases of "fraud, criminal behavior, or willful disregard of the regulations in this subpart or in which public health, interest, or safety requires." None of those predicates is met as to ELDT Direct.

156. The Notice's stated legal basis is inapplicable to ELDT Direct on its own terms. Paragraph 6.d of the Notice invokes 49 C.F.R. § 380.707(a), which by its express language governs "all accepted applicants for behind-the-wheel (BTW) training." Paragraph 6.i rests its finding on "the requirement that driver trainees receiving BTW training certify that they will meet FMCSA's driver qualifications." Paragraph 6.l defines material deficiency in part by reference to a provider that "delivers BTW training." Paragraph 7.a rests the willfulness finding on the same behind-the-wheel obligations. ELDT Direct delivers no behind-the-wheel training, accepts no applicants for behind-the-wheel training, and is recorded in FMCSA's own Registry as offering neither range nor public-road instruction. Each of these predicates is therefore inapplicable to ELDT Direct as a matter of law.

157. The Notice itself states the obligations it relies on. At paragraph 6.k, FMCSA states that its regulations "do require training providers to provide theory instruction about ELP and require BTW driver-trainees to certify they will comply with the qualification standards, including ELP." The first obligation is an obligation to instruct. The second attaches only to behind-the-wheel trainees. ELDT Direct delivers no behind-the-wheel training. On the Notice's own statement of the law, the only obligation that applied to ELDT Direct was to provide theory instruction about English language proficiency, and ELDT Direct did so in every version of both of its courses.

158. Paragraph 6.d of the Notice paraphrases § 380.707(a) as requiring a certification of compliance with "FMCSA's driver qualification regulations in 49 CFR Part 391." The regulation contains no such requirement. It requires a certification of compliance with the listed parts only as "related to controlled substances testing, age, medical certification, licensing, and driving record."

The Notice's paraphrase omits that limitation, and only by omitting it can the certification be read to reach English language proficiency.

159. Independently, 49 C.F.R. § 380.707(a) imposes no English-language-proficiency screening obligation on any training provider. The certification it requires is a trainee's certification of prospective compliance concerning controlled substances testing, age, medical certification, licensing, and driving record. The only verification it requires of a provider is that an applicant hold a valid commercial learner's permit or commercial driver's license. No provision of 49 C.F.R. Part 380 requires a training provider to assess, verify, or attest to a driver-trainee's English language proficiency.

160. No fraud has been alleged against ELDT Direct. The Notice of Emergency Removal does not allege that ELDT Direct engaged in fraud.

161. No criminal behavior has been alleged against ELDT Direct. The Notice of Emergency Removal does not allege that ELDT Direct engaged in criminal behavior.

162. Willful disregard has not been and cannot be established. ELDT Direct taught and tested ELP in every stored version of its Class A and Class B courses since early 2022. The Notice identifies no prior warning, audit finding, corrective direction, or refusal to correct. And 57 of the 61 drivers completed ELDT Direct's course before June 25, 2025, when English-proficiency noncompliance first became an out-of-service condition.

163. Paragraph 6.l of the Notice of Emergency Removal defines a material deficiency in two ways only: theory curriculum that fails adequately to instruct non-English-speaking driver-trainees about ELP requirements, and the delivery of behind-the-wheel training to drivers who certify compliance and do not meet the ELP standard. Paragraph 6.m finds neither. It makes no finding that ELDT Direct's curriculum failed to instruct on ELP requirements, and ELDT Direct delivers no behind-the-wheel training. What paragraph 6.m finds instead is that ELDT Direct certified the completion of theory training by drivers later cited for ELP violations. That is not a material deficiency under the Notice's own definition.

164. No genuine emergency existed. The Notice does not rely on any crash involving an ELDT Direct trainee, identifies no imminent risk from any current trainee, and relies on a

retrospective data match with validation defects. Any curriculum concern could have been addressed through § 380.723(b)–(c), not immediate nationwide cessation of ELDT Direct's operations.

165. Federal agencies possess only the authority Congress has conferred upon them, and a federal district court has jurisdiction over an original suit to set aside agency action taken in excess of the agency's delegated powers. *See Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (an agency's "power to act and how [it is] to act" are "authoritatively prescribed by Congress").

166. Because the statutory predicates for emergency removal under 49 C.F.R. § 380.723(e) were not met, Defendants acted beyond the scope of their delegated authority with respect to ELDT Direct.

167. As a direct result of Defendants' actions, ELDT Direct has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

**COUNT VI – REQUEST FOR EMERGENCY INJUNCTIVE RELIEF**
**(ELDT Direct, LLC)**

168. ELDT Direct incorporates by reference all the allegations in paragraphs 1–4, 7–8, 11–35, 55–69, 133–149, and 151–167 above in support of its claim for emergency injunctive relief against the Defendants as if fully set forth herein.

169. ELDT Direct seeks a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) and a preliminary mandatory injunction pursuant to Federal Rule of Civil Procedure 65(a), restoring ELDT Direct's listing on the TPR pending final resolution of this action.

170. A plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008); *see also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*).

171. ELDT Direct is likely to succeed on the merits of Count IV and Count V. It is an online theory-only provider; FMCSA relied on 61 records out of approximately 2,900 reported theory completions; one record is chronologically impossible; the Notice supplies no driver-specific proof of proficiency at reporting; and ELDT Direct received no pre-deprivation notice of the English-proficiency ground. The longstanding ELP instruction and testing in both courses further undermine FMCSA's findings of noncompliance and willful disregard.

172. Absent injunctive relief, ELDT Direct will suffer irreparable harm. The emergency removal has completely shut down its online theory operations. ELDT Direct cannot provide Class A or Class B theory training, cannot report completions, cannot earn revenue, and faces permanent closure. The loss of students, staff, goodwill, and market position cannot be recovered.

173. Because Defendants are agencies and an officer of the United States, and because the United States' waiver of immunity under 5 U.S.C. § 702 extends only to relief other than money damages, no action for damages lies against Defendants for the losses described above. ELDT Direct has no statutory damages remedy for the revenue, enterprise value, or goodwill it loses each day the removal remains in effect. The injury is therefore irreparable and legally uncompensable. *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013) (economic loss that cannot be recovered because of sovereign immunity is irreparable).

174. The balance of equities tips decisively in ELDT Direct's favor. Where the Government is the opposing party, the balance of harms and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). ELDT Direct faces total destruction of its online theory business, while Defendants face at most a temporary administrative inconvenience. FMCSA can continue to monitor ELDT Direct's compliance while this litigation proceeds. The balance of total business destruction against temporary administrative inconvenience is not close.

175. An injunction serves the public interest. The public interest favors lawful agency action, constitutional due process, accurate regulatory enforcement, and maintaining available theory-training capacity for commercial drivers. Restoring ELDT Direct pending lawful review does not undermine public safety; it preserves training access while permitting FMCSA to address any curriculum concern through the ordinary corrective-action process.

176. As a direct result of Defendants' actions, ELDT Direct has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

**COUNT VII – VIOLATION OF THE FIFTH AMENDMENT—PROCEDURAL DUE PROCESS**
**(ELDT Chimp, LLC)**

177. ELDT Chimp incorporates by reference all of the allegations in paragraphs 1–4, 9–35, and 70–86 above in support of its claim for violation of the Fifth Amendment to the United States Constitution against the Defendants as if fully set forth herein.

178. ELDT Chimp possesses a constitutionally protected property interest in its listing on the TPR.

179. The Supreme Court has held that a license whose continued possession is essential to the pursuit of a livelihood is a constitutionally protected property interest. *See Bell v. Burson*, 402 U.S. 535, 539 (1971).

180. ELDT Chimp's TPR listing is the functional equivalent of a professional license. Without it, ELDT Chimp cannot lawfully provide online theory training or report theory completions. The listing is essential to ELDT Chimp's livelihood and to the continued operation of its business.

181. Defendants have deprived ELDT Chimp of its constitutionally protected property interest without constitutionally adequate process. The three-factor balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), requires consideration of: (1) the private interest affected; (2) the risk of an erroneous deprivation through the procedures used, and the probable value of additional safeguards; and (3) the government's interest, including the fiscal and administrative burden of additional process.

182. The "root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). ELDT Chimp was given none.

183. The private interest is overwhelming. The emergency removal has completely shut down ELDT Chimp's online theory-only operations. ELDT Chimp cannot provide Class A or Class B theory training, cannot report completions, and faces permanent closure. Students cannot complete their training and staff face layoffs.

184. The regulatory framework provides no assured prompt post-deprivation hearing or decision. Section 380.723(d) gives a provider thirty days to request review, provides only that FMCSA "may ask" the provider to attend a conference, and sets no deadline for a hearing, no deadline for a decision, and no stay or interim relief. ELDT Chimp therefore has no assured date on which it will be heard or answered while the removal operates in full force.

185. Where an agency summarily suspends or withdraws a license without a prior hearing, the Due Process Clause requires at a minimum that the licensee be assured a prompt post-deprivation hearing and a prompt decision. *See Barry v. Barchi*, 443 U.S. 55 (1979).

186. The contrast with the scheme the Supreme Court upheld in *FDIC v. Mallen*, 486 U.S. 230 (1988), is instructive. There the statute required a hearing within 30 days of a request and a decision within 60 days after the hearing, so that the suspended party was assured a decision within 90 days. *Id.* at 243. Section 380.723 assures nothing comparable.

187. Section 380.723 is defective in precisely that respect. It does not require a hearing at all; it provides only that FMCSA "may ask" the provider to attend a conference. It fixes no date by which any conference or hearing must occur, no deadline by which FMCSA must decide, and no stay or interim relief of any kind.

188. On September 25, 2026, ELDT Chimp submitted a written request for administrative review under 49 C.F.R. § 380.723(d). As of the filing of this Complaint, FMCSA has not asked ELDT Chimp to attend a conference, has not scheduled any proceeding, has not issued any decision, and has not identified any date by which it will do so. ELDT Chimp has remained shut down since August 31, 2026. The regulation supplies no deadline that would change this, and no stay or interim relief of any kind.

189. The consequence is that ELDT Chimp is suffering the entire penalty—the closure of its online theory business—before any opportunity to contest FMCSA's proof.

190. The deprivation is total rather than partial. Removal from the Registry eliminates ELDT Chimp's lawful theory-training business because a provider not listed on the Registry may not deliver entry-level driver training or certify driver-trainees. The penalty is complete from the first day.

191. The risk of erroneous deprivation is extreme. FMCSA relied on 90 records out of approximately 12,500 reported theory completions, without a denominator, rate, driver-specific evidence, violation-code analysis, or disposition analysis. Six records are chronologically impossible, two of them among the ten inspection reports FMCSA selected as representative, and the Notice identifies no evidence that any cited driver was deficient when ELDT Chimp reported completion. ELDT Chimp also received no pre-deprivation notice of the English-proficiency ground.

192. The operative ground for removal was never communicated to ELDT Chimp before the emergency removal itself. ELDT Chimp received no notice of proposed removal, no statement of the English-proficiency ground, and no opportunity to respond or correct.

193. The government's interest does not justify dispensing with due process. The Notice does not rely on any crash involving an ELDT Chimp trainee, identifies no imminent risk from any current trainee, and identifies no validated provider-specific emergency. Less drastic alternatives were available, including notice, an opportunity to respond, corrective action, and interim monitoring.

194. As a direct result of the Defendants' actions, ELDT Chimp has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

## <u>COUNT VIII – ULTRA VIRES AGENCY ACTION</u>
## (ELDT Chimp, LLC)

195. ELDT Chimp incorporates by reference all of the allegations in paragraphs 1–4, 9–35, 70–86, and 178–194 above in support of its claim for ultra vires agency action against the Defendants as if fully set forth herein.

196. Both the Notice of Emergency Removal and the agency's action identify 49 U.S.C. § 31305(c)(5) as statutory authority. That provision directs the Secretary to establish final regulations and a process by which providers demonstrate compliance; it does not itself confer authority to remove a provider in an individual adjudication or emergency.

197. Section 31305(c)(5) is a rulemaking directive. The process the Secretary established pursuant to that command is codified at 49 C.F.R. § 380.723. Its ordinary course, set out at § 380.723(b) and (c), requires a notice of proposed removal, an opportunity to respond, and an opportunity to take corrective action before removal becomes effective. Section 380.723(e) permits FMCSA to depart from that course only where the enumerated emergency predicates are present. Absent those predicates, subsections (b) and (c) supply the only lawful path to removal.

198. In removing ELDT Chimp without commencing the process required by § 380.723(b) and (c), and without any of the predicates that § 380.723(e) requires for departing from it, FMCSA acted outside the only authority Congress conferred and outside the only process the Secretary established under it. ELDT Chimp never received any prior notice or investigation concerning the ground relied upon for removal.

199. Independently, an agency is bound by its own regulations for so long as they remain in force and may not depart from them in an individual case. *Accardi v. Shaughnessy*, 347 U.S. 260 (1954). FMCSA disregarded the procedure its own regulation prescribes when it removed ELDT Chimp without the notice, response, and corrective-action process.

200. Section 380.723(e) permits emergency removal only in cases of "fraud, criminal behavior, or willful disregard of the regulations in this subpart or in which public health, interest, or safety requires." None of those predicates is met as to ELDT Chimp.

201. The Notice's stated legal basis is inapplicable to ELDT Chimp on its own terms. Paragraph 6.d of the Notice invokes 49 C.F.R. § 380.707(a), which by its express language governs "all accepted applicants for behind-the-wheel (BTW) training." Paragraph 6.i rests its finding on "the requirement that driver trainees receiving BTW training certify that they will meet FMCSA's driver qualifications." Paragraph 6.l defines material deficiency in part by reference to a provider that "delivers BTW training." Paragraph 7.a rests the willfulness finding on the same behind-the-

wheel obligations. ELDT Chimp delivers no behind-the-wheel training, accepts no applicants for behind-the-wheel training, and is recorded in FMCSA's own Registry as offering neither range nor public-road instruction. Each of these predicates is therefore inapplicable to ELDT Chimp as a matter of law.

202. The Notice itself states the obligations it relies on. At paragraph 6.k, FMCSA states that its regulations "do require training providers to provide theory instruction about ELP and require BTW driver-trainees to certify they will comply with the qualification standards, including ELP." The first obligation is an obligation to instruct. The second attaches only to behind-the-wheel trainees. ELDT Chimp delivers no behind-the-wheel training. On the Notice's own statement of the law, the only obligation that applied to ELDT Chimp was to provide theory instruction about English language proficiency, and ELDT Chimp did so in every version of its courses.

203. Paragraph 6.d of the Notice paraphrases § 380.707(a) as requiring a certification of compliance with "FMCSA's driver qualification regulations in 49 CFR Part 391." The regulation contains no such requirement. It requires a certification of compliance with the listed parts only as "related to controlled substances testing, age, medical certification, licensing, and driving record." The Notice's paraphrase omits that limitation, and only by omitting it can the certification be read to reach English language proficiency.

204. Independently, 49 C.F.R. § 380.707(a) imposes no English-language-proficiency screening obligation on any training provider. The certification it requires is a trainee's certification of prospective compliance concerning controlled substances testing, age, medical certification, licensing, and driving record. The only verification it requires of a provider is that an applicant hold a valid commercial learner's permit or commercial driver's license. No provision of 49 C.F.R. Part 380 requires a training provider to assess, verify, or attest to a driver-trainee's English language proficiency.

205. No fraud has been alleged against ELDT Chimp. The Notice of Emergency Removal does not allege that ELDT Chimp engaged in fraud.

206. No criminal behavior has been alleged against ELDT Chimp. The Notice of Emergency Removal does not allege that ELDT Chimp engaged in criminal behavior.

207. Willful disregard has not been and cannot be established. ELDT Chimp taught ELP in every version of its courses since it was listed on the Registry on September 25, 2024. The Notice identifies no prior warning, audit finding, corrective direction, or refusal to correct, and 64 of the 90 drivers FMCSA identified completed ELDT Chimp's course before English-proficiency noncompliance became an out-of-service condition.

208. Paragraph 6.l of the Notice of Emergency Removal defines a material deficiency in two ways only: theory curriculum that fails adequately to instruct non-English-speaking driver-trainees about ELP requirements, and the delivery of behind-the-wheel training to drivers who certify compliance and do not meet the ELP standard. Paragraph 6.m finds neither. It makes no finding that ELDT Chimp's curriculum failed to instruct on ELP requirements, and ELDT Chimp delivers no behind-the-wheel training. What paragraph 6.m finds instead is that ELDT Chimp certified the completion of theory training by drivers later cited for ELP violations. That is not a material deficiency under the Notice's own definition.

209. No genuine emergency existed. The Notice does not rely on any crash involving an ELDT Chimp trainee, identifies no imminent risk from any current trainee, and relies on a retrospective data match with validation defects. Any curriculum concern could have been addressed through § 380.723(b)–(c), not immediate nationwide cessation of ELDT Chimp's operations.

210. Federal agencies possess only the authority Congress has conferred upon them, and a federal district court has jurisdiction over an original suit to set aside agency action taken in excess of the agency's delegated powers. *See Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (an agency's "power to act and how [it is] to act" are "authoritatively prescribed by Congress").

211. Because the statutory predicates for emergency removal under 49 C.F.R. § 380.723(e) were not met, Defendants acted beyond the scope of their delegated authority with respect to ELDT Chimp.

212. As a direct result of Defendants' actions, ELDT Chimp has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

**COUNT IX – REQUEST FOR EMERGENCY INJUNCTIVE RELIEF**
**(ELDT Chimp, LLC)**

213. ELDT Chimp incorporates by reference all the allegations in paragraphs 1–4, 9–35, 70–86, 178–194, and 196–212 above in support of its claim for emergency injunctive relief against the Defendants as if fully set forth herein.

214. ELDT Chimp seeks a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) and a preliminary mandatory injunction pursuant to Federal Rule of Civil Procedure 65(a), restoring ELDT Chimp's listing on the TPR pending final resolution of this action.

215. A plaintiff seeking a temporary restraining order or preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008); *see also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*).

216. ELDT Chimp is likely to succeed on the merits of Count VII and Count VIII. It is an online theory-only provider; FMCSA relied on 90 records out of approximately 12,500 reported theory completions; six records are chronologically impossible, including two of the ten reports FMCSA offered as representative; the Notice supplies no driver-specific proof of proficiency at reporting; and ELDT Chimp received no pre-deprivation notice of the English-proficiency ground.

217. Absent injunctive relief, ELDT Chimp will suffer irreparable harm. The emergency removal has completely shut down its online theory operations. ELDT Chimp cannot provide Class A or Class B theory training, cannot report completions, cannot earn revenue, and faces permanent closure. The loss of students, staff, goodwill, and market position cannot be recovered.

218. Because Defendants are agencies and an officer of the United States, and because the United States' waiver of immunity under 5 U.S.C. § 702 extends only to relief other than money

damages, no action for damages lies against Defendants for the losses described above. ELDT Chimp has no statutory damages remedy for the revenue, enterprise value, or goodwill it loses each day the removal remains in effect. The injury is therefore irreparable and legally uncompensable. *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013) (economic loss that cannot be recovered because of sovereign immunity is irreparable).

219. The balance of equities tips decisively in ELDT Chimp's favor. Where the Government is the opposing party, the balance of harms and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). ELDT Chimp faces total destruction of its online theory business, while Defendants face at most a temporary administrative inconvenience. FMCSA can continue to monitor ELDT Chimp's compliance while this litigation proceeds. The balance of total business destruction against temporary administrative inconvenience is not close.

220. An injunction serves the public interest. The public interest favors lawful agency action, constitutional due process, accurate regulatory enforcement, and maintaining available theory-training capacity for commercial drivers. Restoring ELDT Chimp pending lawful review does not undermine public safety; it preserves training access while permitting FMCSA to address any curriculum concern through the ordinary corrective-action process.

221. As a direct result of Defendants' actions, ELDT Chimp has been substantially damaged and continues to suffer irreparable damage on a daily basis without any meaningful opportunity to be heard before its property interest and business enterprise are destroyed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs CDL Direct, LLC, ELDT Direct, LLC, and ELDT Chimp, LLC respectfully request that this Court grant the following relief:

(a) Issue a temporary restraining order immediately restoring Plaintiffs' listings on the Training Provider Registry pending a hearing on the motion for preliminary injunction or alternatively postponing the effective date of the removals;

(b) An order directing removal from the public Registry record of any designation regarding any Plaintiff that indicates emergency or involuntary removal;

(c) Issue a preliminary injunction maintaining Plaintiffs' respective listings on the Training Provider Registry pending final resolution of this action;

(d) A declaration that certificates of completion issued by Plaintiffs before August 31, 2026 remain valid and shall not be rejected, revoked or re-examined on the ground of the removal, so that driver-trainees who completed training in reliance on Plaintiffs' listing are not separately penalized;

(e) Enter judgment in favor of Plaintiffs and vacate the FMCSA's August 31, 2026 emergency removals of Plaintiffs from the Training Provider Registry as unlawful, ultra vires, and in violation of the Due Process Clause of the Fifth Amendment;

(f) Award Plaintiffs their costs and attorneys' fees under 28 U.S.C. § 2412 or as otherwise permitted by law; and

(g) Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Ralf R. Rodriguez*
Ralf R. Rodriguez, Esq.
Florida Bar No: 138053
FOX ROTHSCHILD LLP
2 S. Biscayne Boulevard, Suite 2750
Miami, FL 33131
Telephone: 786-501-7361
Email: ralfrodriguez@foxrothschild.com
*Counsel for Plaintiffs CDL Direct, LLC, ELDT Direct, LLC, and ELDT Chimp, LLC*

Dated: October 13, 2026

Docusign Envelope ID: DE3D9E26-B5AA-8438-81FE-6C726A10189F


## VERIFICATION

I, Magdiel Fernandez, am the Director of Operations of CDL Direct, LLC, ELDT Direct, LLC, and ELDT Chimp, LLC, and make this verification on behalf of all three entities from my own knowledge except where otherwise stated.

I have read the foregoing Verified Complaint and verify that the factual allegations concerning CDL Direct, LLC, ELDT Direct, LLC, and ELDT Chimp, LLC are true and correct of my own personal knowledge unless I specifically state they are made on information and belief, which I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Date: October 13, 2026

Signed by:

Magdiel Fernandez

E7C6448AB29542A...

______________________________

Magdiel Fernandez